## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JAMES WHEELER**                                     **CIVIL ACTION**

**VERSUS**                                                    **No. 20-1021**

**NORFOLK SOUTHERN**                            **SECTION I**
**RAILWAY COMPANY, ET AL.**

### ORDER AND REASONS

Before the Court is defendant Norfolk Southern Railway Company's ("Norfolk") motion[1] for summary judgment. The plaintiff, James Wheeler ("Wheeler"), opposes the motion.[2] For the following reasons, the motion for summary judgment is granted.

### I. FACTUAL BACKGROUND

This case arises from a December 21, 2016 injury suffered by Wheeler at Norfolk's railyard. It turns on the issue of whether Wheeler can be considered Norfolk's employee for purposes of the Federal Employers' Liability Act ("FELA").

*The Contract Between Hulcher and Norfolk*

In July 2016, Norfolk entered into a contract with Hulcher, Professional Services, Inc. ("Hulcher") to provide services at derailment sites for Norfolk on an "as-requested basis, twenty-four (24) hours per day, seven (7) days per week[.]"[3] The scope of such services and the equipment to be used were to be determined on a case-

---

[1] R. Doc. No. 20.
[2] R. Doc. No. 53.
[3] R. Doc. No. 20-3, at 2.

by-case basis.[4]  The contract did not obligate Norfolk to use Hulcher at any particular derailment.[5]

The contract describes Hulcher as an "Independent Contractor[,]" stating:

Contractor shall be and remain an original and independent party hereunder, and all matters to be performed by Contractor shall be its own separate business, under its management, supervision and direction.  Contractor shall employ, pay from his own funds and discharge all persons engaged in the performance of the [services described *supra*], and all such persons shall be and remain the sole employees of Contractor.  Nothing contained in this Agreement is intended to create a joint venture or to constitute either party as agent . . . of the other.  Contractor and its employees shall have no right or authority, and shall not enter into any contract, commitment or agreement, make any representations, or incur any debt or liability, of any nature, in the name of or on behalf of [Norfolk].[6]

The contract imposes some of Norfolk's internal rules on Hulcher and its employees, requiring Hulcher to "comply with all [Norfolk] safety rules[.]"[7]  The contract also requires Hulcher to (1) have its employees attend job briefings conducted by Norfolk or Hulcher; (2) keep its employees up-to-date on environmental and hazardous material training; and (3) assure that its employees wear Hulcher-supplied safety gear at work sites.[8]

The contract also gives Norfolk the right to "temporarily or permanently bar from [Norfolk's] property any of [Hulcher]'s employees . . . for any [] lawful reason"

---

[4] *Id.*
[5] *Id.* ("[Norfolk] may decline to use [Hulcher's] [s]ervices . . . for any . . . reason.").
[6] *Id.* at 16.
[7] *Id.* at 11.
[8] *Id.* ("All personal safety items . . . for [work] performed at any derailment site . . . shall be provided by [Hulcher] to its employees . . . at no expense to [Norfolk].").

without specifying its reason for doing so.[9]   However, the contract adds that "[t]he decision to bar one or more of [Hulcher's employees] from [Norfolk] property shall not be interpreted as a request for [Hulcher] to fire the individual(s)."[10]

The contract also requires Hulcher to "secure background investigations . . . through e-VERIFILE.com[,]" of Hulcher employees assigned to Norfolk's property, stating that "a successful background investigation is a mandatory requirement" for access.[11]   However, the same provision adds that "[n]othing in this background investigation requirement is to be taken as preventing [Hulcher] from hiring any particular individual or requiring [Hulcher] to terminate such individual if already hired[.]"[12]   Similarly, Norfolk "leaves [any additional background check] to the sole discretion of [Hulcher.]"[13]   And while the contract acknowledges that Norfolk negotiated rates for the background checks, it makes clear that payment is Hulcher's responsibility.[14]

Additionally, the contract allows Norfolk to "conduct inspections of the [work] performed by [Hulcher] as [Norfolk] deems desirable to ensure that the [work is] being performed in accordance with" the contract.[15] And, "if such inspections indicate

---

[9] *Id.* at 11–12.
[10] *Id.* at 12.
[11] *Id.* at 23–24.
[12] *Id.*
[13] *Id.* at 25.
[14] *Id.* at 24.
[15] *Id.* at 16.

that the [work is] not being properly performed, [Hulcher] shall at its sole cost and expense remedy the deficiencies therein."[16]

The contract goes on to state that while Norfolk may "assign [its] personnel to work directly in conjunction with [Hulcher] or perform work at a derailment site[,]" Norfolk personnel "shall remain under the direction and control of [Norfolk] supervisors, and [Hulcher] personnel shall remain under the direction and control of [Hulcher]'s supervisors, there being no intention to render the employees of either as 'loaned' employees of the other[.]"[17] However, "[t]he decision of [Norfolk] with respect to all matters of coordination with other contractors and/or other [Norfolk] workers shall be final and binding upon [Hulcher]."[18]

*James Wheeler*

Wheeler began working for Hulcher in September or October of 2016.[19] Wheeler alleges that "[o]n or about December 21, 2016" Norfolk "retained the services of Hulcher to re-rail equipment in the yard near St. Ferdinand Street in New Orleans, Louisiana[,]" and that "the yard . . . [was] owned and operated by" Norfolk.[20] Wheeler further alleges that, on December 21, 2016, while employed by Hulcher and working at the yard, he "was assisting in rigging down the boom on heavy equipment used in

---

[16] *Id.* at 16.
[17] *Id.* at 15 (explaining this is "only to enable the work to be efficiently and expeditiously conducted by coordination and cooperation of the separate" workforces).
[18] *Id.* at 16.
[19] Wheeler has alleged that he began working for Hulcher in September of 2016.  R. Doc. No. 1, at 2 ¶ 6.  Documents submitted indicate that Wheeler was hired October 10, 2016.  *See, e.g.*, R. Doc. No. 53-8.  The parties do not dispute that he was working for Hulcher at the time of the accident.
[20] R. Doc. No. 1, at 2 ¶¶ 7, 9.

the re-railing process when an operator negligently operated that equipment resulting in the amputation of the third (middle finger), fourth (ring finger) and fifth (little finger) digits on his right hand."[21]

Wheeler submitted what he describes as the "Hulcher Accident Report."[22] That document describes him as the company's "employee" and indicates that he was hired October 10, 2016.[23]   The form notes that on December 21, 2016, while being supervised by Jose Chavez,[24] Wheeler was "[r]igging [d]own a 583 . . . [and] unhooked the split eye from the pole[.]"[25] He then "placed his right hand on the load line to get slack to reverse[.  T]he operator Chris Davis attempted to reverse line but line came in first[,] crushing [Wheeler's] fingers between the line and the cable."[26]   The document lists the "root cause" of the accident as "incorrect training – knowledge[.]"[27] A handwritten page addended to the report lists as a "contributing factor" the fact that "[t]he operator on the machine was not the normal operator[.]"[28] The operator in question was a Hulcher employee, though Wheeler contends that he, like Wheeler, is a Norfolk employee for purposes of FELA.[29]

*Norfolk's Interaction with Hulcher Employees During Jobs*

---

[21] *Id.* at 2 ¶ 8.
[22] R. Doc. No. 53-8.   Norfolk does not dispute the document's veracity.
[23] *Id.* at 1.
[24] The form lists as "customer" "N.S. – Stacy [sic] Brown[,]" presumably a reference to Norfolk and its foreman, Stacey Brown.  *Id.*
[25] *Id.* at 2.
[26] *Id.*
[27] *Id.* at 3.
[28] *Id.* at 4.
[29] *See* R. Doc. No. 53, at 10.

In a declaration, Wheeler states that, while at the yard, a Norfolk "employee had the right to direct my work if they desired[,]" and that, had they directed him to do something, he "would have done it."[30]   Wheeler claims that Norfolk "employees could stop me from working if they desired[,]" and that, if one had done so, he "would have stopped working."[31]  He adds that he (1) had to obey Norfolk's rules while at the yard; (2) was tested on those rules; and (3) understood that a failure to adhere to them would allow Norfolk to "remove [him] or have [him] removed from the property."[32]

In a June 2020 deposition Stacey Brown, Norfolk's "Senior General Foreman" on duty on December 21, 2016, explained that his role was "to supervise [Norfolk] employees."[33]  He added that "when there's a derailment [for which Norfolk uses Hulcher's services] and [he is] notified[,]" he "calls Hulcher" and "tell[s] them the equipment [Norfolk] need[s]," but that Hulcher "determine[s] their manpower."[34]

When Wheeler's counsel asked Brown if he could "tell [Hulcher employees] how to come in and out of the yard[,]" Brown replied: "No . . . . I already know . . . that they are a contractor for us[.]"[35]  When pressed on whether he had "the *right* to tell them to enter the yard [from] another direction[,]" Brown confirmed that he did.[36]

Brown also stated that the Norfolk yardmaster authorizes all access to the tracks in the yard and that he (or any other Norfolk employee) could tell Hulcher to

---

[30] R. Doc. No. 53-1, at 2 ¶¶ 7–8.
[31] *Id.* at 1 ¶¶ 5–6.
[32] *Id.* at 2 ¶¶ 9–11.
[33] R. Doc. No. 53-2, at 3.
[34] *Id.* at 5.
[35] *Id.* at 6.
[36] *Id.* (emphasis added).

stop work for any reason.[37]   However, when asked if he could "tell Hulcher to stop doing [something] in [an unsafe] manner and to do it in a different way[,]" Brown responded, "No, I don't tell them to stop doing in [sic] a different way.  I just tell [Hulcher's employee] to stop, and then his supervisor would determine" what to do.[38]

Brown also acknowledged that he could "ask a contractor to leave Norfolk['s] property[,]" but added that in his twenty-two years with Norfolk, he had never removed a contractor nor heard of such a thing happening.[39]

Lastly, Brown stated that he was unaware of any injury occurring on December 21, 2016; that "[i]f I was aware of it, I would remember"; and that, had such an injury occurred, Hulcher "should have" reported it to him or someone else in the yard.[40]

Wheeler also submitted as evidence the June 2020 deposition transcript of Preston Hunter.[41]   Hunter, the yardmaster for Norfolk on duty December 21, 2016, indicated that he had no particular recollection of the day or personal knowledge of Wheeler's accident.[42]   Hunter stated that his responsibilities included "controlling the yard, controlling the movement in the yard, assigning the guys their various duties[,] . . . breaking trains down[,] . . . sending trains out, [and] getting the road crews outbound."[43]   Hunter added that he "control[s] most things that happen in the

---

[37] *Id.* at 6–7.

[38] *Id.* at 7.

[39] *Id.* at 9.

[40] *Id.*

[41] R. Doc. No. 53-4, at 1.

[42] *Id.* at 3.

[43] *Id.*

yard as far as the crews that's working, transportation crews."[44]   When asked if "there['s] anything [he doesn't] control in the yard[,]" Hunter responded, "I control mostly anything . . . . [I]f you . . . do something in the yard, [you need] permission from the yardmaster."[45]   Hunter explained, however, that he "never work[s] with Hulcher[;]"[46] never interacts with Hulcher;[47] and never directly supervises "the activity or work" of Hulcher and its crews.[48]

Hunter explained that, when there is a derailment requiring Hulcher's services, "[Norfolk's m]echanical [department] asks for permission to do their work, and I give mechanical permission and they give Hulcher [permission]."[49]   Hunter explained that this permission amounted to taking the area in which Hulcher was working out of service.[50]   When asked if he could force Hulcher to stop working, Hunter indicated that, in an emergency, he could tell the mechanical department to stop them, but "that's something I would never had [sic] to do[,]" because "where I'm at in the tower, I wouldn't be looking at Hulcher . . . because I turn them over to mechanical . . . . I really wouldn't know what Hulcher would be doing, and I wouldn't

---

[44] *Id.*
[45] *Id.*
[46] *Id.* at 5.
[47] *Id.* at 3.
[48] *Id.* at 8.
[49] *Id.* at 3.   He added that once Norfolk's mechanical department has permission, Hulcher "doesn't have to get permission" from him to do their work.  *Id.* at 6.
[50] *Id.* at 3–4.

be looking at Hulcher."[51]  On re-direct, Hunter indicated that Norfolk would not have provided Wheeler's tools in the ordinary course.[52]

### The Declarations and Testimony of Scott Spray

Scott Spray ("Spray"), Hulcher's Human Resource Manager, made an April 2020 declaration, submitted by Norfolk, "based upon [his] personal knowledge as the Human Resources Manager of Hulcher."[53]  The declaration stated that Wheeler was "hired, employed, paid, [and] trained" by Hulcher, not Norfolk—a claim that Wheeler does not dispute.[54]  Spray adds that Norfolk (1) did not hire Wheeler;[55] (2) could not fire Wheeler;[56] (3) did not pay Wheeler;[57] and (4) did not supply Wheeler with tools or equipment.[58]  The declaration also contains a number of assertions regarding the legal effect of the contract between Norfolk and Hulcher.[59]

In a June 2020 deposition, Spray acknowledged that he was not employed by Hulcher at the time of the incident, telling Wheeler's counsel: "[Y]ou may get a little . . . of 'I'm not sure, I don't know[.]'"[60]  When asked about the contract, Spray

---

[51] *Id.* at 4–5.
[52] *Id.* at 8.
[53] R. Doc. No. 20-2, at 1 ¶ 1.  Norfolk described the document on the docket as the "Hulcher Declaration[.]"
[54] *Id.* at 4 ¶ 11.
[55] *Id.* at 5 ¶ 15.
[56] *Id.* at 5 ¶ 16.
[57] *Id.* at 5 ¶ 17.
[58] *Id.* at 5 ¶ 18.
[59] *See, e.g., id.* at 3–4 ¶ 9.
[60] R. Doc. No. 53-3, at 4.

repeatedly demurred or indicated that he didn't know enough to offer an opinion.[61] When asked to explain his use in his declaration of the term "borrowed servant[,]" Spray stated it was "legal language that was provided for me" and indicated he didn't know what it meant.[62]

Spray offered an additional declaration submitted by Norfolk with its reply, described as the "Declaration of Hulcher Services[.]"[63] The declaration and attached corporate records indicate that, prior to working at the Norfolk yard, Wheeler had been employed by Hulcher on projects for fourteen other Hulcher customers and that the incident occurred during Wheeler's first day at the Norfolk site.[64] Spray's declaration also indicates that, as part of Hulcher's orientation, employees "undergo online e-Railsafe training" and that Wheeler did so.[65] The declaration also attaches corporate records detailing training Wheeler underwent after being hired.[66]

## II. LEGAL STANDARD

### *Summary Judgment*

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking

---

[61] *Id.* at 5 (explaining that Spray was "not normally exposed to [such contracts]" and that "this is not a document I typically deal with in my role with the company" before describing what a contractual provision meant to him "as a layperson").

[62] *Id.* at 13. He also described the term "servant" as "legal boilerplate[.]" *Id.* at 12.

[63] R. Doc. No. 54-1.

[64] *Id.* at 2–8.

[65] *Id.* at 2.

[66] *Id.* at 16.

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence[.]" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore*

11

*Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

*FELA*

FELA provides a "remedy for employees of interstate railroads to recover from a railroad for injuries incurred during the course of their employment." *Morris v. Gulf Coast Rail Grp.*, 829 F. Supp. 2d 418, 423 (E.D. La. 2010) (citing *Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004)). FELA provides, in relevant part:

> Every common carrier by railroad . . . engaging in commerce between any of several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines . . . or other equipment.

45 U.S.C. § 51. "[T]o prevail under [FELA], a plaintiff must prove that (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) [the plaintiff] was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." *Morris*, 829 F. Supp. 2d at 423 (quoting *Weaver v. Missouri Pac. R.R.*, 152 F.3d 427, 429 (5th Cir. 1998)).

<u>Employee of a Railroad</u>

"In *Kelley v. S. Pac. Co.*, the United States Supreme Court explained that the terms 'employee' and 'employed' as used in FELA describe a conventional 'master-servant'[67] relationship, to be determined by reference to common law principles." *Id.* (citing 419 U.S. 318, 323 (1974)).   The *Kelley* Court explained:

> Under common-law principles, there are basically three methods by which a plaintiff can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. *See* Restatement (Second) of Agency § 227; *Linstead v. Chesapeake & O. Ry. Co.*, 276 U.S. 28 (1928). Second, he could be deemed to be acting for two masters simultaneously. *See* Restatement § 226; *Williams v. Penn. R.R. Co.*, 313 F.2d 203, 209 (2d Cir. 1963). Finally, he could be a subservant of a company that was in turn a servant of the railroad.  *See* Restatement § 5(2); *Schroeder v. Penn. R.R. Co.*, 397 F.2d 452 (7th Cir. 1968).

419 U.S. at 324.   While these are described as three separate theories (and Norfolk initially made arguments directed at them individually), courts "analyzing the issue of FELA liability under any of the three prongs of *Kelley* have uniformly focused on whether the railroad controlled or had the right to control the plaintiff at the time of his injury." *See Schmidt v. Burlington N. and Santa Fe Ry. Co.*, 605 F.3d 686, 692 n.2 (9th Cir. 2010) (Callahan, J., concurring) (collecting cases).

In *Lindsey v. Louisville & Nashville R.R. Co.*, the Fifth Circuit explained:

> [U]nder [FELA] a worker can be the 'employee' of a railroad even though [employed by] another company and paid by that other company. The test of employment is the established test in workers' compensation cases.  It is whether the railroad has control of the employee or the right to control the employee. The law does not require that the railroad have full supervisory control. It requires only that the railroad, through its

---

[67] The terms 'servant' and 'employee' are used interchangeably in the relevant case law and filings.

employees, plays 'a significant supervisory role' as to the work of the injured employee.

775 F.2d 1322, 1324 (5th Cir. 1985) (quoting *Kelley*, 419 U.S. at 327).  Courts in this circuit have applied this test to complaints using various *Kelley* theories.  *See, e.g.*, *Morris*, 829 F. Supp. 2d at 423 (applying *Lindsey* to a subservant-of-a-servant argument); *McGee v. Ill. Cent. Gulf R.R. Co.*, 86-4764, 1987 WL 20113, at *1 (E.D. La. Nov. 17, 1987) (applying *Lindsey* to a borrowed employee theory); *Dominics v. Ill. Cent. R.R. Co.*, 934 F. Supp. 223, 225–27 (S.D. Miss. 1996) (addressing a subservant-of-a-servant argument by discussing agency principles before applying *Lindsey*); *see also Ancelet v. Nat'l R.R. Passenger Corp.*, 913 F. Supp. 968, 970–71 (E.D. La. 1995) (applying *Lindsey* while drawing upon the Fifth Circuit's borrowed employee caselaw); *Smith v. Norfolk S. Corp.*, No. 89-5199, 1991 WL 121197, at *1 (E.D. La. June 25, 1991) (citing *Lindsey* and directly applying the Fifth Circuit's borrowed employee but adding that "[i]n the FELA context a court must apply this test with a focus on the control factor").  This is in line with the national practice noted in *Schmidt*.  *See* 605 F.3d at 692 n.2.

As noted, these courts (and others in the Fifth Circuit facing *Kelley*-based FELA employment arguments) have leaned, to varying degrees, on circuit caselaw from outside the FELA context related to the particular employment theories at issue.  *See, e.g.*, *Ancelet*, 913 F. Supp. at 971 (applying *Lindsey* to a borrowed employee argument but using factors set forth in *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238 (5th Cir. 1988), a case interpreting the term in the context of Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a)).  Wheeler makes conclusory

allegations regarding all three theories, *see* R. Doc. No. 1, at 2 ¶ 11, but makes generalized arguments that subsume the theories into the larger question of control. Moreover, he does not set forth a *Melancon* borrowed employee argument or lean on agency principles to argue that Norfolk employed Hulcher in making his subservant-of-a-servant argument, *see* R. Doc. No. 53.   The Court will consequently evaluate all three theories in light of the broader body of FELA caselaw, as an individual analysis of each theory would yield the same result.

The Third Circuit employs a test similar to that set forth in *Lindsey*: "[T]he primary factor to be considered in determining whether a plaintiff was employed by the defendant [under FELA] is whether the latter had the power to direct, control and supervise the plaintiff in the performance of his work at the time he was injured."[68]   *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1350 (3d Cir. 1991) (internal citations and quotations omitted).   *Williamson* offered the following factors to aid in the analysis: (1) "who selected and engaged the plaintiff to do the work; [(2)] who paid his wages for performing it; [(3)] who had the power to terminate his employment; [(4)] who furnished the tools with which his work was performed[;] and [(5)] the place of work."   *Id.*   The Court has employed the *Williamson* factors to aid in applying *Lindsey* to determine whether a plaintiff was an employee of the defendant for purposes of FELA.   *See Morris*, 829 F. Supp. 2d at 424.

---

[68] While *Williamson* was quoting Third Circuit caselaw predating *Kelley*, it also noted that "the Supreme Court in *Kelley*[] and now the Fifth Circuit in *Lindsey* have emphasized the control factor in determining [] employer-employee status[.]"   *Id.*

"The mere fact that a railroad reserves the right to assure performance in accordance with the specifications of [a] contract does not render a contractor a railroad employee." *Id.* (citing *Sullivan v. Gen. Elec. Co.*, 226 F.2d 290, 291 (6th Cir. 1955)). "Courts have distinguished the 'authoritative direction and control' indicative of a master-servant relationship from 'mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Id.* (quoting *Kelley*, 419 U.S. at 329 (internal citation omitted)).

The *Kelley* Court noted that "evidence of contacts between [a railroad's employees and a contractor's] employees may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *See* 419 U.S. at 330. "The informal contacts between the two groups *must assume a supervisory character* before the" contractor's employees can be treated as railroad employees. *Id.* (emphasis added).

### Summary Judgment on FELA Claims

The Fifth Circuit has stated that, in FELA suits, "the plaintiff's burden of proof is 'featherweight' and 'our precedents clearly establish that in this Circuit, a judgment as a matter of law against the plaintiff . . . is appropriate 'only when there is a complete absence of probative facts' supporting the plaintiff's position.'" *Howard v. Canadian Nat'l/Ill. Cent. R.R.*, 233 F. App'x 356, 357 (5th Cir. 2007) (quoting *Rivera*, 378 F.3d at 506) (alterations omitted). This is "in sharp contrast to the more demanding test applicable in other civil cases[.]" *Id.* at 357 (emphasis omitted).

16

However, this rule does not extend beyond the negligence element of a FELA claim; the parties' burdens with respect to the employment status element, for example, are the same as they would be on a typical motion for summary judgment. *See, e.g.*, *Morris*, 829 F. Supp. 2d at 422. *Rivera* noted: "To prevail . . . [plaintiff] need only adduce some evidence that tends to show *that his employer's negligence*" *had even the slightest role in leading to the injury*. 378 F.3d at 507 (emphasis added). And the Eighth Circuit has repeatedly applied the traditional summary judgment standard to the issue of employment status. *E.g.*, *Royal v. Mo. & N. Ark. R.R. Co.*, 857 F.3d 759, 763–64 (8th Cir. 2017); *see Thomas v. Union Pac. R.R. Co.*, 16-04052, 2018 WL 3747467, at *2–3 (W.D. Ark. Aug. 7, 2018) (collecting cases and noting "a review of several decisions reveals that, although courts apply a relaxed standard of proof regarding the question of . . . negligence[,] . . . the question of whether the plaintiff was employed by the railroad is not subject to a more lenient standard"). Consequently, the Court will apply the normal summary judgment standard when evaluating Wheeler's employment status.

## III. ARGUMENTS

### *Norfolk's Argument*

Norfolk argues (1) that it did not employ Wheeler and 2) that he was not a "borrowed employee," "dual servant," or "subservant of a servant."[69]

---

[69] R. Doc. No. 20-1, at 16. In in its initial memorandum, Norfolk argued that borrowed employee status is a "matter of law for the district court to determine." *Id.* at 15–16. However, the Fifth Circuit stated in *Lindsey* that "the question . . . is [one] of fact for the jury." 775 F.2d at 1324. Because the Court finds that no reasonable jury could find for plaintiff, it need not determine how the issue is best treated.

Citing *Lindsey* and the factors set forth in *Williamson*, Norfolk argues that Wheeler was not its employee because "Norfolk did not play 'a significant supervisory role'" in his employment and because "Hulcher was not a servant of Norfolk[.]"[70] Norfolk argues that it did not have a significant supervisory role with respect to Wheeler because: (1) "Hulcher performed the derailment services subject to the [c]ontract[;]" (2) "Wheeler was supervised at all times by Hulcher employees who provided Wheeler's equipment and tools for him[;]" (3) "[t]he operator who took part in the re-railing process was a Hulcher employee who oversaw Wheeler's work[;]" and (4) "Hulcher trained, supervised, and directed Wheeler's work throughout the derailment process."[71]

Norfolk proceeds to argue that Hulcher was an independent contractor, rather than an employee, because "[t]he extent of the actual supervision exercised . . . is the most important element to be considered in determining whether or not one is dealing with . . . employees."[72] Norfolk argues that "[g]lobal oversight is not sufficient to establish control."[73] Norfolk adds, relying on *Kelley*, "[neither] is cooperation and consultation in coordinated operations."[74] Norfolk argues that its contract with

---

Norfolk's initial memorandum also offered (1) a standard for the Court to apply to "borrowed employee" status and (2) a standard for the Court to apply to the "dual employee" and "subservant" theories.  R. Doc. No. 20-1, at 15–17.  Norfolk's later briefing appears to adopt the latter for all three theories.  *See* R. Doc. No. 54.

[70] *Id.* at 18.

[71] *Id.*

[72] *Id.* at 18–19 (quoting *N. American Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989)).

[73] *Id.* at 19 (citing *N. American Van Lines*, 869 F.2d at 599).

[74] *Id.*

Hulcher limits it to "precisely the type of global oversight that is not sufficient to establish the existence of a master-servant relationship between Norfolk and Hulcher[,]" as "Norfolk reserved [only] the right to determine whether Hulcher was upholding its obligations under the contract."[75]

Norfolk further argues that the instant case is "nearly identical" to *Dominics*, 934 F. Supp. at 223, a FELA case granting summary judgment against a plaintiff using a sub-servant theory of employment.[76] That court granted summary judgment, Norfolk argues, among other reasons, because the contractor (1) was required to supervise and pay its employees and provide their equipment; (2) had "the exclusive right to hire and fire its employees;" and (3) "was substantially self-sufficient with regard to the work . . . performed."[77]

Norfolk concludes by arguing that there are two factual situations where a plaintiff can win under *Lindsey*: (1) if a "railroad exercise[s] directive control over the day-to-day operations of a contractor[,]"[78] or (2) if "the contractor's employee receive[s] specific instructions from the railroad with respect to the injury-causing event."[79]   Absent evidence of either, Norfolk concludes, summary judgment is appropriate.

*Wheeler's Argument*

---

[75] *Id.* (citing *Moss v. Cent. of Ga. R.R. Co.*, 135 Ga. App. 904 (1975)).

[76] *Id.*

[77] *Id.* at 19–20.

[78] *Id.* at 23–24 (citing *Baker v. Tex. and Pac. Ry. Co.*, 359 U.S. 227 (1959); *Lindsey*, 775 F.2d at 1322).

[79] *Id.* at 24 (citing *Haymon v. Union Pac. R.R. Co.*, 547 F. Supp. 2d 594 (W.D. La. 2008)).

At the outset, Wheeler argues that "[c]ourts, 'due to the liberal construction and interpretation of FELA claims,'" should grant summary judgment only "'when there is a complete absence of probative facts supporting the plaintiff's position.'"[80]

Wheeler argues that, although he was employed by Hulcher, Norfolk may still be considered his employer for purposes of FELA liability because, at the time of the accident, he "was a borrowed servant, acting for two masters simultaneously, or was [a] subservant of Hulcher which in turn was a servant of" Norfolk.[81]

Wheeler explains that Norfolk "had an excessive amount of control and the right to control [him] and other Hulcher employees[,]"[82] because the contract (1) states "that Hulcher will only provide services at [Norfolk]'s request . . . . [and will] be available twenty-four (24) hours a day and seven (7) days a week[;]" (2) gives Norfolk "the right to designate [] equipment and personnel Hulcher will bring[;]"[83] (3) limits Hulcher, while working at Norfolk sites, to "personnel . . . who passed an E-Verifile background check" for which Norfolk negotiated a discount on behalf of Hulcher;[84] and (4) gives Norfolk the right to remove Hulcher employees from its property for any reason.[85]  Additionally, (1) Wheeler was required "to pass a test on [Norfolk]'s rules[;]" (2) the Norfolk yardmaster, "Preston Hunter . . . testified he played a significant supervisory role . . . and [] controlled mostly anything in the

---

[80] R. Doc. No. 53, at 2 (quoting *McCormick v. New Orleans Pub. Belt R.R. Comm'n*, No. 16-1897, 2017 WL 2267204, at *2 (E.D. La. May 24, 2017)).

[81] R. Doc. No. 1, at 2 ¶ 11.

[82] R. Doc. No. 53, at 3.

[83] *Id.* at 3–4.

[84] *Id.* at 4.

[85] *Id.*

yard[;]" (3) Brown testified that he "had the right to instruct" Hulcher crews as to how to enter the yard; (4) any Norfolk "employee can stop Hulcher's work in the [railyard] during [a] derailment[;]" (5) Wheeler believed that Norfolk "employees had the right to direct" his work; and (6) in order for a Hulcher crew to work, Norfolk's "mechanical department . . . [had to request] the track and time[.]"[86]

Wheeler argues that "[t]he only evidence [Norfolk] possesses supporting their position that [Norfolk] did not play a significant supervisory role in overseeing [his] work is the Declaration of Scott Spray, the human resources manager for Hulcher."[87] Wheeler attacks the evidentiary value of the declaration, pointing to Spray's testimony that "he did not have personal knowledge . . . [and] did not work for Hulcher when the accident occurred."[88]  Wheeler also appears to argue that Norfolk offers no evidence that it was not his employer other than Spray's initial declaration.[89]

Wheeler relies heavily on the *Williamson* factors, which the Court used in *Morris*.  He argues that there is a dispute of material fact as to whether he was an employee of Norfolk because it "[Norfolk] contributed significantly to determining whether or not Hulcher hired" him because of the background check requirement.[90] Wheeler concedes that Hulcher paid his wages, but argues that Norfolk had some

---

[86] *Id.* at 3–6.

[87] *Id.* at 6.

[88] *Id.* at 6–7.

[89] *Id.* at 7.  A portion of the relevant sentence in Wheeler's memorandum is missing, making the argument difficult to follow.

[90] *Id.* at 11 ("[I]f [Wheeler] failed the background check, he could not work on [Norfolk] property."  Therefore, Norfolk "contribute[d] to the determination of hiring [him].").

21

control over any decision by Hulcher to terminate him.[91]   In his opposition to the motion, Wheeler also questions whether Hulcher provided his tools.[92]   Finally, Wheeler points out that the incident occurred on Norfolk's property and that this fact supports the conclusion that he was a Norfolk employee.[93]

Wheeler also points the Court to *Collins v. Union Pac. R.R. Co.*, 143 Cal. Rptr. 3d, 849 (Ct. App. 2012), suggesting it is more apt than *Morris*.[94]   In *Collins*, a case also involving Hulcher, a California court declined to set aside a jury's finding that the plaintiff was an employee of a railroad, concluding that substantial evidence supported the finding.   *See id.* at 857.   The court noted that when "authoritative direction and control" exists (as opposed to the "minimum cooperation necessary to carry out a coordinated undertaking"), "[t]he control need not be exercised; it is sufficient if the right to direct the details of the work is present." *Id.* at 858.

### *Norfolk's Response*

In response, Norfolk rejects Wheeler's argument that the background check represented significant supervision.[95]   Norfolk points out that Wheeler completed a separate security screening when hired by Hulcher, two months before he was assigned to the Norfolk yard.[96]

---

[91] *Id.*
[92] *Id.*   Wheeler does not allege that Norfolk supplied the tools.
[93] *Id.* at 12.
[94] *Id.* at 7.
[95] R. Doc. No. 54, at 8–9.
[96] *Id.* at 8.

Norfolk argues that *Collins* is distinguishable from the instant case.[97]  Norfolk contends that *Collins* turned "primarily [on the fact that the railroad] played a significant supervisory role in many aspects of Hulcher's work[.]"[98]  Norfolk adds that it, unlike the railroad in *Collins*, "did not control Hulcher's ingress or egress at derailment sites[,]" citing its employees' testimony.[99]

Norfolk submits that the Court should focus primarily on "whether or not the railroad had the power to direct, control, or supervise the plaintiff in the performance of his work *at the time he was injured*."[100]  Norfolk reiterates its argument that the test is "who had *immediate* control . . . *at the time of the injury*."[101]  Norfolk notes that, per Hulcher's accident report,[102] the supervisor on duty was Jose Chavez, a Hulcher employee.[103]  Norfolk notes that the yardmaster on duty, Hunter, "did not have any personal knowledge of the accident when he was deposed and was not at the accident scene at any time."[104]  Similarly, Brown, the foreman, "did not remember the derailment; he only learned about it after being provided with" an incident report.[105]

Norfolk also argues that its hands-off relationship with Hulcher indicates a lack of control.[106]  Norfolk notes that, in his testimony, "Brown made it clear that he

---

[97] *Id.* at 2–3.

[98] *Id.*

[99] *Id.* at 6.

[100] *Id.* at 3 (citing *Williamson*, 926 F.2d at 1350).

[101] *Id.* (citing *Shenker v. Baltimore & Oh. R.R. Co.*, 374 U.S. 1 (1963)).

[102] R. Doc. No. 53-8.

[103] R. Doc. No. 54, at 4 (citing R. Doc. No. 53-8, at 1).

[104] *Id.* (citing R. Doc. No. 53-4, at 3).

[105] *Id.* (citing R. Doc. No. 53-2, at 3–4).

[106] *Id.* at 5.

does not exert supervisory control over Hulcher's employees or tell them how to do their jobs[.]"[107]   Norfolk adds that its yardmaster "never interacts with Hulcher directly and never instructs Hulcher in any way."[108]   This, Norfolk explains, is consistent with the contract, which "states that all matters to be performed by Hulcher are to be done from its direction, which includes any instructions."[109]

Norfolk adds that the communication that did typically occur between Norfolk and Hulcher employees was the sort necessary in the "coordinated operations" countenanced by *Kelley*.[110]  "Hulcher and Norfolk played . . . consulting roles to make decisions involving control of the work."[111]

## IV. ANALYSIS

Norfolk argues that Wheeler cannot succeed on his FELA claim because, among other reasons, he was not an employee of the railroad.  Wheeler argues that he has presented sufficient evidence to create a genuine issue of material fact as to whether he was a Norfolk employee.  Because the Court concludes that Wheeler has failed to raise a material factual issue as to this point, it does not review the other elements of his FELA claim.

*Spray Declaration and Testimony*

---

[107] *Id.* (citing R. Doc. No. 53-2, at 6 ("Once they start working, basically me, I am just hands off.")).

[108] *Id.* (citing R. Doc. No. 53-4, at 5).

[109] *Id.* (citing R. Doc. No. 20-3, at 16).

[110] *Id.* (citing 419 U.S. at 326–27).

[111] *Id.* ("[W]hen a derailment [occurred], Brown and [Chavez] would discuss and consult together . . . to determine the type of equipment that [] needed to be utilized.").

Before beginning the analysis, the Court must turn to the initial declaration and testimony of Scott Spray, which the Court finds concerning. Spray's initial declaration indicates that he has "personal knowledge" of its contents, albeit "as the Human Resource Manager of Hulcher[.]"[112]   In the declaration, Spray makes numerous statements about the contents of the contract between Norfolk and Hulcher.[113]   But at his deposition, Spray repeatedly disclaimed any particular knowledge of the contract and the legal conclusions "he" reached, saying that he had not written the analysis.[114]   When asked how he could know, having not been with Hulcher on the relevant date, whether Norfolk had supervised Wheeler, he indicated that he was stating Hulcher's position.[115]   Days after Wheeler filed his reply to Norfolk's summary judgment motion, Norfolk filed with its response a second declaration, also offered by Spray on behalf of Hulcher.[116]

For the avoidance of doubt: The Court has not relied on Spray's contractual analysis or legal conclusions in evaluating whether Norfolk has raised the issue of an absence of a dispute of material fact. The contract is in the record; both parties rely on it.

---

[112] R. Doc. No. 20-2, at 1 ¶ 1.

[113] *See, e.g.*, *id.* at 5 ¶ 14 ("The Contract does not establish that Hulcher was a servant of Norfolk[.]").

[114] *See, e.g.*, R. Doc. No. 53-3, at 13 ([T]hat was verbiage that was, you know, kind of recommended."); *id.* ("[I] think I've indicated that I'm not sure of the exact legal meaning of a few of [the] terms [included in my declaration.]").

[115] *Id.* at 15 ("It was relayed to me [by Hulcher.]").

[116] R. Doc. No. 54-1.

As to Spray's testimony on behalf of Hulcher about the basic facts of Wheeler's employment and Hulcher's procedures: Wheeler has raised no real question about its credibility. The fact that Spray was not employed by Hulcher at the time of the incident does not call into question his testimony, as Hulcher's *human resources manager*, about the company's employment practices and records. And "conclusory allegations that a witness lacks credibility cannot defeat a motion for summary judgment." *Avdeef v. Rockline Indus.*, 404 F. App'x 844, 845 (5th Cir. 2010) (per curiam) (affirming summary judgment where nonmoving party raised conclusory allegations about moving party's evidence but "failed to provide" evidence to support an element of its claim).

More importantly, the Court is obligated to resolve any credibility issues, or questions of reasonable inference, in Wheeler's favor, as he is the nonmoving party. If, in the absence of Spray's problematic testimony, Wheeler would have established a dispute of material fact, the Court could not grant summary judgment. *See Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 317 (5th Cir. 2015) ("[T]he court should give credence to the evidence favoring the nonmovant[.]" (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000))).

However, a party moving for summary judgment is not tasked with producing irrefutable evidence negating an element of the nonmoving party's case; it need only show enough to demonstrate that the nonmoving party has failed to produce evidence raising a dispute. *See Little*, 37 F.3d at 1075 ("We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is,

when both parties have submitted evidence of contradictory facts.   *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.*" (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990)) (emphasis in original).  Once Norfolk has pointed to the absence of evidence, which it has, summary judgment is proper if Wheeler has failed to produce evidence showing a genuine dispute of material fact as to whether Wheeler was 'employed' by Norfolk—regardless of the relative strength of Norfolk's evidence.

### Wheeler was not directly employed by Norfolk.

Wheeler *does not allege* that he was employed in the traditional sense[117] by Norfolk.  Consequently, Wheeler's argument[118] that a genuine issue of material fact exists because Norfolk relies on Spray's initial declaration to prove that it did not employ him fails.[119]

### *Wheeler has failed to raise a genuine dispute of material fact as to whether he was an employee of Norfolk for purposes of FELA under* Kelley *and* Lindsey.

As explained *infra*, Wheeler offers insufficient evidence to raise a genuine dispute of material fact as to his employment status.  Norfolk has done more than enough to point out the absence of a dispute as to whether Wheeler was employed by Norfolk for purposes of FELA.  *Matsushita* is clear: Once the party seeking summary judgment carries its burden, "the nonmoving party must come forward with specific

---

[117] As opposed to 'employed' for purposes of FELA.
[118] R. Doc. No. 53, at 7.
[119] His assertion is also inaccurate.  Hulcher's employment records, submitted by Norfolk, go to this point.  *See* R. Doc. No. 54-1.  And Wheeler himself has repeatedly acknowledged that he was employed by Hulcher.  *See, e.g.*, R. Doc. No. 1, at 2 ¶ 6.

facts showing that there is a *genuine issue for trial*." 475 U.S. at 587 (emphasis in original) (citations omitted). While Wheeler repeatedly asserts that Norfolk exercised "significant supervisory control," the showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *See Little*, 37 F.3d at 1075 (citations omitted). And, as explained *infra*, the only real evidence put forth by Wheeler does not move the dial under the very caselaw he cites.

As previously stated, *Kelley* dictates that Wheeler may be considered Norfolk's employee for purposes of FELA if he (1) is Norfolk's borrowed employee; (2) is deemed to be a dual employee of Norfolk and Hulcher; or (3) is a servant of Hulcher, which is in turn a servant of Norfolk. *See* 419 U.S. at 324. This Circuit held in *Lindsey* that plaintiffs' claims of employment pursuant to *Kelley* should be determined using "the established test in workers' compensation cases . . . . [Does] the railroad . . . play[] a 'significant supervisory role'[?]" 775 F.2d at 1324. The parties agree that the test set forth in *Lindsey* controls here; moreover, both use the factors set forth by the Third Circuit in *Williamson* to examine whether Norfolk exercised "significant supervisory control."[120] The Court finds that analysis with or without the *Williamson* factors as a guide yields the same result—Norfolk's interactions with Hulcher and Wheeler were "the passing of information" and "accommodation . . . required in a large and necessarily coordinated operation[,]" not evidence of a supervisory relationship. *See Kelley*, 419 U.S. at 330.

---

[120] R. Doc. Nos. 20-1, 54 (Norfolk); R. Doc. No. 53 (Wheeler).

*Supervision of Wheeler and his Hulcher colleagues*

The Hulcher incident report introduced by Wheeler indicates that Wheeler's supervisor at the time of the incident was Chavez, a Hulcher employee.[121]  Chavez's presence and supervisorial role are corroborated by the testimony of Brown,[122] who explained that "the [Hulcher] supervisor I dealt with on a regular basis was Chavez[,]" and that Chavez was the Hulcher supervisor "[i]n that area."[123]

Wheeler states that Hunter "testified [that] he played a significant supervisory role . . . and controlled most[] anything in the yard."[124]  It is true that Hunter stated that he controlled *the yar*d and that he had a significant supervisory role over "the *yard*[.]"[125]  However, Hunter *did not state that he controlled or supervised Wheeler and Hulcher*.  Brown and Hunter both clearly testified that they were not supervising Wheeler at the time of the incident.[126]  Hunter explicitly stated that he was not at the accident site, never interacted with Hulcher, and had no interaction with or knowledge of Wheeler prior to the lawsuit.[127]  When asked if he ever directly supervised Hulcher, Hunter confirmed that he did not.[128]

---

[121] R. Doc. No. 53-8, at 1.
[122] This is testimony Wheeler relies on.  *See, e.g.*, R. Doc. No. 53, at 4 ("Brown . . . stated he would normally contact Hulcher[.]") (citing R. Doc. No. 53-2).
[123] R. Doc. No. 53-2, at 5–6.  Wheeler does not dispute Chavez was employed by Hulcher.
[124] R. Doc. No. 53, at 5 (citing R. Doc. No. 53-4, at 3).
[125] R. Doc. No. 53-4, at 3 (emphasis added).
[126] Specifically, Brown testified that he was unaware of the incident and that "[i]f I was aware of it, I would remember" it.  R. Doc. No. 53-2, at 9.
[127] R. Doc. No. 53-4, at 3, 8.
[128] *Id.* at 8.

Wheeler also states that the contract gives Norfolk "the right to designate what equipment and personnel Hulcher will bring" to a derailment.[129]   This is an incomplete description of the provision Wheeler cites, which states, in relevant part:

> [Norfolk] shall designate items of [Hulcher's] equipment, personnel and material to be utilized in performing [work] according to guidelines attached [to the contract] . . . . *Any equipment, personnel or materials not authorized by [Norfolk] shall be utilized at [Hulcher's] sole expense.*[130]

The provision appears to simply limit Norfolk's responsibility for payment to pre-arranged terms.

Wheeler does not name a Norfolk employee who was supervising him or could have done so.   He does not identify an unnamed Norfolk employee who was supervising him or could have done so.   His evidence that he was supervised by Norfolk instead boils down to the following facts: (1) the work occurred on Norfolk's property, to which Norfolk controlled access;[131] (2) Norfolk required that he pass a particular background check before he entered the yard and comply with its safety rules;[132] (3) a Norfolk employee could have told him to stop what he was doing if they saw him do something dangerous;[133] (4) Norfolk could have expelled him from the yard if it wished to do so;[134] (5) Brown, Norfolk's foreman, would request Hulcher's

---

[129] R. Doc. No. 53, at 3–4 (citing R. Doc. No. 20-3).
[130] R. Doc. No. 20-3, at 2 (emphasis added).
[131] *See, e.g.*, R. Doc. No. 54 (acknowledging the fact).
[132] R. Doc. No. 20-3, at 23–24.
[133] *See* R. Doc. No. 53-2, at 7.   While the evidence on this point is dubious, the Court resolves this question in Wheeler's favor, as it must.
[134] R. Doc. No. 20-3, at 12; R. Doc. No. 53-2, at 9 (though Brown indicated he had never removed a contractor or heard of it happening).

services and coordinate with its supervisors regarding the appropriate equipment;[135] and (6) that Norfolk's mechanical department secured track-time from the yardmaster so that Norfolk could work on them.[136]

Despite Wheeler's suggestions to the contrary, the record does not contain evidence from which a jury could conceivably infer that Norfolk employees directed or could have directed him to conduct his work in a certain manner. *See Lindsey*, 775 F.2d at 1324. The contract explicitly states that, while Norfolk may "assign [Norfolk] personnel to work directly in conjunction with [Hulcher] or perform work at a derailment site[,] . . . [Hulcher] personnel shall remain under the direction and control of [Hulcher]'s supervisors, there being no intention to render the employees of either as 'loaned' employees of the other, but only to enable the work to be efficiently and expeditiously conducted by coordination and cooperation of the separate" companies.[137] That the contract describes Hulcher as an independent contractor and states that its employees are not employees of Norfolk is not preclusive of Wheeler's claim, in and of itself. *See, e.g.*, *Morris*, 829 F. Supp. 2d at 427–29 (identifying similar language in a contract between the defendant railroad and a contractor but going on to analyze other indicia of control). Wheeler could certainly

---

[135] Wheeler states, citing Brown's deposition, that "Brown would request the equipment needed for the derailment." R. Doc. No. 53, at 4 (citing R. Doc. No. 53-2, at 5). Brown did confirm that he would "tell [Chavez] what equipment to bring." R. Doc. No. 53-2, at 5. However, Brown explained, in the page range provided by Wheeler, that, when requesting Hulcher's services, he would phone Chavez. *Chavez* would "tell [him] what equipment that he thinks he needs, and we will have that discussion" and reach an agreement. *Id.* at 6.

[136] R. Doc. No. 53-4, at 6.

[137] R. Doc. No. 20-3, at 15.

have offered evidence that, notwithstanding the language of the contract, supervision and control was occurring on the ground.  But Brown and Hunter's testimony offers Wheeler nothing.[138]   While their testimony is not dispositive in and of itself at the summary judgment stage, Wheeler has not offered any evidence to the contrary.  His sole evidence on the point is his own conclusory statement in his declaration that, while at the yard, a Norfolk "employee had the right to direct my work if they desired[,] and that, had they directed him to do something, he "would have done it."[139] However, absent *any* evidentiary support, "[s]uch self-serving statements . . . are insufficient to create a triable issue of fact."  *See Inmon v. Mueller Copper Tube Co.*, 757 F. App'x 376, 382 (5th Cir. 2019); *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013) ("[W]ithout more, a . . . conclusory affidavit is insufficient to create a genuine issue of material fact in the face of conflicting probative evidence." (citing *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 482 (5th Cir. 2002))); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment where the only evidence offered by the nonmoving party was his own affidavit and noting that "such self-serving allegations are not the type of significant probative evidence required to defeat summary judgment.") (citations omitted).

---

[138] After confirming that he could tell Hulcher to stop doing something dangerous, Brown explained that he could not direct the work itself: "No, I don't tell them . . . a different way.  I just tell [Hulcher's employee] to stop, and then [their] supervisor would determine how . . . to do it."  *See* R. Doc. No. 53-2, at 7.  *See also* R. Doc. No. 53-4, at 3–5 (Hunter's testimony that, while he "control[led] mostly anything" in the yard, he never interacted with Hulcher and wouldn't have been able to see Wheeler).
[139] R. Doc. No. 53-1, at 2 ¶¶ 7–8.

As for Wheeler's remaining evidence: Norfolk concedes that the work occurred at Norfolk's yard. And, as discussed *infra*, this factor weighs in Wheeler's favor. However, this Court and others have found that the site of the incident, standing alone, is inadequate to create a material issue of fact as to employment status. *See, e.g.*, *Morris*, 829 F. Supp. 2d at 429–30 ("Although [the railroad] provided the place of work, this is only one factor and not determinative."); *Ancelet*, 913 F. Supp. at 975 (granting summary judgment and stating that the "fact, without more," that "the place of performance [of plaintiff's work] was provided by" the railroad "does not determine the issue of plaintiff's status"); *Johnson v. R.R. Controls, L.P.*, No. 11-1722, 2014 WL 279758, at *5 (W.D. La. Jan. 22, 2014) (dismissing FELA claims due to employment status despite uncontroverted evidence that the accident occurred on the railroad's tracks); *Dominics*, 934 F. Supp. at 224–25 (granting summary judgment for defendant railroad on FELA claim in accident that occurred while crew was grinding railroad's tracks).

The facts that Wheeler has pointed to evidence that Norfolk could control access to the yard, coordinated with Hulcher's supervisors, and required him to understand its safety rules and pass a background check before entering the property are similarly inadequate. In *Johnson*, the plaintiff alleged that the railroad "issued access cards and training cards that were required of all contractors in order to be permitted access to" the railroad's property and "exercise[d] control over [the contractor's] employee certification, training, and clearance as it pertains to these [sic] employees doing work for" the railroad and that "every worker on the job site

33

must possess documentation showing [the railroad's] logo." 2014 WL, at *7. The *Johnson* court found those facts insufficient to allege employment for purposes of FELA on any of the theories set forth in *Kelley*, noting that they were unsurprising in the context of such an independent contractor relationship: "[I]t was certainly reasonable for [the railroad], the [railyard] property owner, to be concerned about workers performing potentially hazardous work on its land." *Id.* (quoting *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 674 (6th Cir. 2010)).

*Collins*, the California state court decision Wheeler relies on, [140] offers a useful contrast to the facts of this case. 143 Cal. Rptr. 3d at 849. There, the court declined to set aside a jury verdict in the plaintiff's favor, noting that "Union Pacific supervised work at the derailment site." *Id.* "Union Pacific . . . could and would tell a Hulcher crew what it wanted done *and how to do it. A Union Pacific supervisor might give signals or directions to Hulcher employees directing them in the operation of Hulcher equipment.*" *Id.* at 859 (emphasis added). No evidence (other than Wheeler's conclusory statements) exists in the record to support an inference of such control, particularly where it runs counter to the language of the contract, the testimony of Norfolk employees as to their roles, the incident report indicating that Wheeler was being supervised by a Hulcher employee, and Spray's unchallenged second declaration (and supporting documents) to the contrary.

*Morris* is also instructive. In that case, the railroad and contractor had an 'independent contractor' provision similar to the one here. *See Morris*, 829 F. Supp.

---

[140] The Court notes that the case has no precedential value here.

2d at 421.  The contract gave the railroad at least as much 'termination power' as the instant contract. There, the railroad could demand that disruptive or incompetent contractor employees "be at once discharged and not again employed on the work." *See id.*  The plaintiff cited testimony by a contractor employee that his understanding was that the railroad's chief engineer "is . . . over everything[,]" that the railroad "had control over their track and the yard and the work that [contractors] were doing in that area[,]" and that the railroad "could . . . have [the contractor] re-do the work on their track." *Id.* at 426.  The Court noted that "as the owner of the track and yard" the railroad of course had control over it, but that this does not "provide factual support for [the] assertion that [the railroad] controlled the work of [the contractor's] employees." *Id.*  The Court also pointed to testimony that, while the railroad could instruct the contractor's supervisors to stop work, those supervisors would then "resolve . . . whether we're going to go back to work" as evidence that the contractor, not the railroad, was exercising control.  *See id.* at 427.  And the Court also found that "[t]he fact that [railroad] agents were present at the [worksite] and 'touched base' with [contractor] supervisors to share information and observe [the contractor's] progress does not establish" supervision.  *Id.*  These same observations could both be made of the instant case.

Wheeler argues that *Morris* is distinguishable because that "contract held '[t]he Railroad reserves no control whatsoever over the employment, discharge, compensation of or *services rendered by the Contractor's employees*.' [Norfolk] . . . could not[] make such a statement.  Their own employees testified they had the right

to stop Hulcher employees for any reason[.]"[141]  This argument is unpersuasive.  The railroad in *Morris* also had the ability to halt work.  829 F. Supp. 2d at 427.  Moreover, the contract between Norfolk and Hulcher states:

> The decision to bar one or more [Hulcher employees] from [Norfolk] property shall not be interpreted as a request for [Hulcher] to fire the individual(s) . . . . [Hulcher] personnel shall remain under the direction and control of [Hulcher's] supervisors . . . . [A]ll matters to be performed by [Hulcher] shall be its own separate business under its management, supervision and direction.  [Hulcher] shall employ, pay from [its] own funds and discharge all persons engage in the performance of the [work], and all such persons shall be . . . the sole employees of [Hulcher].[142]

This is similar to the language in *Morris*.

Wheeler also argues that, unlike the railroad supervisors in *Morris*, "[Norfolk] employees played a significant supervisory role[.]"[143]  This argument is conclusory. Wheeler suggests that it is supported by the facts that (1) "[t]he mechanical department requested the track and time" and (2) "the yardmaster testified he played a significant supervisory role and controlled the yard where things could not be done without his permission."[144]  As discussed, Wheeler's statement that Hunter testified he significantly supervised him mischaracterizes Hunter's testimony.  Hunter explicitly stated that he had no interaction with Hulcher and did not directly supervise its activity or work; moreover, he was unaware of Wheeler's existence outside of the context of this litigation.[145]  And the mechanical department's request

---

[141] R. Doc. No. 53, at 6 (emphasis in original) (citations omitted).
[142] R. Doc. No. 20-3, at 12–16.
[143] R. Doc. No. 53, at 6.
[144] *Id.*
[145] *See* R. Doc. No. 53-4, at 3–8.

of track time is the sort of coordination explicitly countenanced by *Kelley*.  *See* 419 U.S. at 330–31.

The *Williamson* factors, which both parties use in their briefing, are illustrative:  Wheeler was Hulcher's employee, not Norfolk's.  Hulcher "selected and engaged the plaintiff to do the work."  *See Williamson*, 926 F.2d at 1350.  Wheeler's complaint acknowledges that he was hired by Hulcher.[146]  The contract makes clear that Norfolk had no role in Hulcher's hiring decisions.[147]  That Wheeler had to undergo a certain background check to work this particular job for Hulcher does not change this.  Wheeler's argument to the contrary[148] is unpersuasive, particularly in light of the uncontroverted business records submitted with Spray's second declaration, which indicate that Wheeler worked on jobs for *fourteen* other Hulcher customers *prior* to working at the Norfolk yard.[149]  Did each of these customers 'contribute to the determination of hiring plaintiff?  The first *Williamson* factor, therefore, suggests that Wheeler was not Norfolk's employee.

It is uncontroverted that Hulcher "paid [Wheeler's] wages[,]" the second *Williamson* factor.[150]  This also weighs in favor of a finding that Wheeler was not Norfolk's employee.

---

[146] R. Doc. No. 1, at 2 ¶ 6.
[147] R. Doc. No. 20-3, at 16.
[148] R. Doc. No. 53, at 10–11.
[149] R. Doc. No. 54-1, at 5–8.
[150] R. Doc. No. 53, at 11.

Wheeler argues that the third *Williamson* factor, which asks "who had the power to terminate [Wheeler's] employment[,]" weighs in his favor.[151]    While acknowledging that the contract *explicitly disclaims* Norfolk's ability to fire Wheeler or request his termination, and declining to produce any evidence that this was not the case, he argues that Norfolk nonetheless had the power to terminate his employment because "a permanent banning could lead to the possibility of termination from Hulcher."[152]  Wheeler's brief cites to Spray's deposition to support this notion.[153]  The Court finds this unpersuasive.

*Morris* explicitly rejected just such a theory, stating that a contractual provision giving the railroad the right to demand the removal of a contractor employee "did not give [the railroad] the right to terminate plaintiff's employment with [the contractor]" and "does not weigh in favor of an employment relationship between plaintiff and" the railroad. 829 F. Supp. 2d at 429.  Moreover, Wheeler mischaracterizes Spray's testimony.  Wheeler's counsel asked Spray "[h]ow . . . Hulcher [would] handle [Norfolk banning an employee] from a human resources perspective[?]"[154] Spray responded: "That's . . . speculation . . . but we would probably only have them work on jobs where other railroads asked us to perform services[.]"[155] When plaintiff's counsel asked whether "termination [would] be a consideration[,]" Spray responded that "[i]t could be possible[,]" before adding "that would be

---

[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] R. Doc. No. 53-3, at 8.
[155] *Id.*

speculation . . . . [I]n the case of [an] individual [who was banned by a railroad for drinking on the job], we term'd them but not at the direction of [the] railroad . . . . We made that decision."[156] This "material question" is, in fact, nothing more than the metaphysical doubt which *Little* and *Matsushita* dictate cannot defeat summary judgment. *See* 475 U.S. at 586; 37 F.3d at 1075. The third *Williamson* factor also cuts against Wheeler.

*Williamson*'s fourth factor asks "who furnished the tools with which [Wheeler's] work was performed." 926 F.2d at 1350. The contract indicates that Hulcher was to provide its own tools.[157] And Wheeler acknowledges that "testimony exists [stating that Norfolk] did not provide the tools."[158] Nonetheless, he argues, "a dispute exists" because "none of the [Norfolk] employees specifically remembered the day and Scott Spray was not employed by Hulcher at the time and did not have personal knowledge."[159] This gets the summary judgment standard backward. Once Norfolk raises the issue, which it has, the onus is on Wheeler to produce *some* evidence. *See Matsushita*, 475 U.S. at 587. Wheeler offers not even an allegation in his own declaration[160] or "statement of uncontested material facts."[161] The fourth factor cuts in Norfolk's favor.

---

[156] *Id.*

[157] R. Doc. No. 20-3, at 2–3.

[158] R. Doc. No. 53, at 11.

[159] *Id.*

[160] *See* R. Doc. No. 53-1.

[161] *See* R. Doc. No. 53-7. This document, like Norfolk's similar submission, is of little use, as it contains numerous 'statements of uncontested material facts' that are anything but uncontested. For example, it is plainly contested that "[p]laintiff was the servant of Hulcher who in turn was a servant of [Norfolk]." *See id.* at 4 ¶ 23.

*Williamson*'s final factor asks where the work was completed.  *See* 926 F.2d at 1350.  It is undisputed that the work occurred on Norfolk's property.  However, as discussed *supra*, multiple courts have found this fact alone is inadequate to preclude summary judgment.

*Lindsey* applies to this case.  *See* 775 F.2d 1322, 1324.  It dictates that in order to establish that Norfolk was his employer, Wheeler must prove it had, or had the right to have, a "'significant supervisory role' as to [his] work[.]"  *See id.* (quoting *Kelley*, 419 U.S. at 327).  As described *supra*, Wheeler has not identified sufficient evidence to create a genuine issue of material fact with respect to whether he was an employee of Norfolk.

## V.

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED** and that plaintiff's claims against Norfolk are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that, in light of this, plaintiff's motion[162] *in limine* and the parties' joint motion[163] to extend the deadline to file motions *in limine* are **DISMISSED AS MOOT**.

New Orleans, Louisiana, October 6, 2020.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[162] R. Doc. No. 59.
[163] R. Doc. No. 60.